IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 19, 2018 Session

## STATE OF TENNESSEE v. TERRY CRAIGHEAD AND SINEAD ST. OMER

**Appeal from the Circuit Court for Rutherford County
Nos. F-75398A, F-75398B Royce Taylor, Judge**

_____

### No. M2017-01085-CCA-R3-CD

_____

The State appeals the trial court's order dismissing the charges against the Defendants, Terry Craighead and Sinead St. Omer, for two counts of felony murder, aggravated child abuse, and aggravated child neglect. The trial court found that the State failed to collect and preserve certain evidence in accordance with the mandates of *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999). We conclude that the State's failure to collect evidence did not result in a *Ferguson* violation and that the trial court erred in dismissing the charges. Accordingly, we reverse the trial court's judgments, reinstate the indictment, and remand for further proceedings in accordance with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Reversed and Remanded**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which TIMOTHY L. EASTER and J. ROSS DYER, JJ., joined.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Jennings H. Jones, District Attorney General; and Hugh Ammerman and Allyson Abbott, Assistant District Attorneys General, for the appellant, State of Tennessee.

Brad W. Hornsby (at trial), Rachel A. Hitt (at trial), and Heather G. Parker (on appeal), Murfreesboro, Tennessee, for the appellee, Terry Craighead.

Gerald L. Melton, District Public Defender, and Jeffrey S. Burton, Assistant District Public Defender, for the appellee, Sinead St. Omer.

**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

The Defendants' charges stem from the death of their five-month-old daughter on November 18, 2013. The State alleged that the Defendants failed to provide the victim, who had multiple health issues and required a feeding tube, with proper nutrition and care and that the victim died of starvation as a result. Prior to trial, the Defendants each filed a motion to dismiss, contending that the State's failure to collect the victim's feeding tube and pump and to preserve the information from the pump violated *State v. Ferguson*. The Defendants attached a manual for a Kangaroo Joey Eternal Feed and Flush Pump and alleged that the feeding pump maintained a seventy-two-hour history of the times and the amounts which the victim was fed. The Defendants maintained that the information stored in the feeding pump would have established that they did not deprive the victim of nutrition as alleged by the State and would have supported their claim that the victim's failure to thrive was due to natural causes.

During a hearing on the morning of the trial, LaVergne Police Detective Kevin Stolinsky testified that on November 18, 2013, he was assigned to investigate the victim's death and responded to the Defendants' room at a weekly rental motel. When he arrived, emergency medical personnel had moved the victim out of the room and were performing CPR on her. Ms. St. Omer informed Detective Stolinsky of the victim's medical issues, and Detective Stolinsky stated that he initially believed that the victim's death was the result of her medical issues.

The Defendants lived in the motel room with the victim and their other child. Detective Stolinsky testified that the room was disorganized and not clean and that alcohol bottles were in the room. As a result, he did "an immediate DCS referral." He observed a machine in the corner of the room, which Ms. St. Omer identified as the victim's feeding pump. The police officers did not collect the feeding pump or any other evidence from the room and only took photographs of the room.

Detective Stolinsky testified that the case did not become "a full blown investigation" until he received the preliminary autopsy report from the medical examiner's office. The preliminary autopsy report was faxed to his office during the late afternoon hours on November 20, and he did not review it until the following morning. Upon reviewing the report, Detective Stolinsky contacted Dr. Adele Lewis, the medical examiner, who advised him that he may need to obtain the feeding pump as evidence. Because it would take a few days to obtain medical documents through a subpoena, he asked Dr. Lewis about companies that may have supplied the feeding pump, and Dr. Lewis mentioned Apria Healthcare ("Apria"). After Detective Stolinsky contacted Apria

and faxed a written request, an Apria employee called Detective Stolinsky later that day and confirmed that Ms. St. Omer was a client. Detective Stolinksy testified that he was informed that the device had been retrieved from the Defendants' home, sanitized, and sent to another person for use.

On cross-examination, Detective Stolinsky testified that although the crime scene technician photographed the feeding pump, he did not believe it was necessary to seize the feeding pump or that he had probable cause to do so. He explained that at the time, he was not conducting a criminal investigation. He said officers were required to take photographs in all cases involving a child's death and provide them to the Child Fatality Review Team in order to complete the Sudden Unexplained Infant Death Investigation ("SUIDI") report and "try to figure out if it's co-sleeping and so forth."

Detective Stolinsky stated that when he spoke to Dr. Lewis, she told him that feeding pumps may retain information and asked him to obtain the information from the victim's feeding pump if possible. He did not speak to the Defendants on November 21 about whether they still had the feeding pump because he understood that Apria had retrieved the pump. At the conclusion of the hearing, the trial court took the Defendants' motions under advisement until additional proof was presented at trial.

According to the evidence presented at trial, the victim was born in June 2013 and remained hospitalized at Vanderbilt Children's Hospital for approximately two months. She was diagnosed with tetralogy of fallot, a heart condition, and DiGeorge Syndrome, a congenital malformation which can result in a spectrum of clinical symptoms, including cardiac and immunity issues. The victim underwent heart surgery during the first week of her life and had a total of three heart catheterizations during the course of her life. She needed an additional heart surgery but died before the surgery could be performed.

The victim was fed formula through a nasogastric ("NG") feeding tube, which entered through her nose and went down the back of her throat and into her stomach. Ms. Kayla Clary, a pediatric dietician who oversaw the victim's nutrition at the hospital, testified that the victim's average weight gain during her initial hospitalization was ten grams per day, which fell within the low range but was typical for an infant's initial hospital stay during which the infant undergoes surgery. Prior to the victim's discharge, Ms. Clary instructed the Defendants on an advanced feeding plan for the victim using a high caloric density formula. The plan required that the victim be fed through a feeding tube four times a day at three-hour intervals and receive a continuous overnight feeding for eight to ten hours. For the nighttime feedings, the Defendants were instructed to replenish the formula in the feeding bag every four hours. A durable medical equipment company supplied the feeding pump, the formula, the tubing, and the syringes to the Defendants. The Defendants received a Kangaroo Joey feeding pump, and Ms. Clary

stated that she was unaware that the feeding pump retained information prior to the initiation of the Defendant's criminal case.

From September 5 to September 11 of 2013, the victim was hospitalized for the failure to thrive. When discharged, the victim weighed 3.55 kilograms and gained an average of twenty to twenty-five grams each day. Ms. Clary provided the Defendants with a written advancement plan that continued the victim's daytime feeding regiment and continuous nighttime feeding regimen. During a doctor's appointment two days following the victim's discharge, she weighed 3.66 kilograms and had an average weight gain of thirty-nine grams per day.

The Defendants missed multiple doctor appointments for the victim on six different days between September 27 and November 15. They took the victim to an emergency room on October 6 when they were unable to reinsert the victim's feeding tube after it came out. They did not seek any other medical treatment for the victim after October 6.

On the morning of November 18, 2013, Lieutenant Konrad Kaul and Officer Zendel Cody Murphy responded to the Defendants' room at the motel, which was located near the police department, following a 9-1-1 call reporting that the victim was not breathing. Lieutenant Kaul saw the victim lying on the foot of the bed and picked her up. He stated that the victim was very small and that he believed that she was one month old or younger. The victim was warm and slightly stiff, and Lieutenant Kaul felt "lots of bones." Officer Murphy testified that the victim was wearing a onesie that was too big, that her eyes and face were sunken in, and that she did not appear "real" but looked like a doll. Lieutenant Kaul was unable to feel the victim's heart beating and performed CPR on the victim until emergency medical personnel arrived. Mr. Donald Matthew Tidwell of the LaVergne Fire Department, who assisted in transporting the victim to the hospital, described the victim as very pale and cyanotic in that she had a blue tinge on her fingertips due to the lack of oxygen. The victim's eyes were sunken in, and her bone structure could be seen in her rib cage, arms, legs, and jaw line.

Officer Murphy spoke to Ms. St. Omer about victim's health conditions and her medications. Ms. St. Omer stated that she woke up at 3:00 a.m. to check on the victim. She woke up again around 5:30 a.m. and saw that the victim's feeding tube was out. Ms. St. Omer stated that after reinserting the feeding tube, she went back to sleep. The victim was not responsive when Ms. St. Omer checked on her at 8:00 a.m.

Lieutenant Kaul described the Defendants' room as "disheveled" with "clutter." Officer Murphy described the Defendants' room as dirty and observed food and liquor bottles in the room, including a liquor bottle at the end of the bed near the victim. Mr.

Tidwell observed trash, food, and clothes lying around the Defendants' room. He also saw an I.V. pole with a monitor and an empty bag on the I.V. pole with tubing attached.

Ms. Kristine Keeves, the crime scene and evidence supervisor with the La Vergne Police Department, was dispatched to the scene and took photographs of the Defendants' room. She identified the photographs that she took at trial and testified to her observations based upon the photographs. Upon arriving, she observed a "no smoking" sign on the door advising that oxygen tanks were inside the room. An alcohol bottle was in a bag next to the heating and air unit, which was set on eighty-nine degrees. On top of a bed were a blanket, pizza boxes, and a line of oxygen tanks. Oxygen tanks, piles of clothes, shoes, toiletries, food boxes, trash, and liquor bottles were strewn throughout the room. On the nightstand were food, a wine glass containing yellowish liquid, another cup containing yellowish liquid, partially empty baby bottles, a bottle of tabasco sauce, a liquor bottle, baby food jars, and a plastic container. The plastic container contained various papers, bottles of medication, a package of cigarettes, tubing, and hypodermic needles. Various items, including a package of cigarettes, were on top of the dresser. A car seat with staining toward the bottom was inside the bassinet, and a piece of pizza crust and a French fry were underneath the car seat.

An empty oxygen tank and an I.V. pole with a bag and monitor were next to the bassinet. Ms. Keeves stated that the bag on the I.V. pole appeared to be empty and that there was white residue along the bottom of the bag and inside the tube. A feeding chart and a medication chart were taped to the wall above the nightstand, but the blank spaces meant to record feedings and medication were not filled out. There were cans of formula, oxygen tanks, diapers, a baby's bath, and cleaning supplies on shelves near the refrigerator.

After taking photographs of the Defendants' room, Ms. Keeves and Detective Stolinsky went to the hospital where Ms. Keeves took photographs of the victim. Ms. Keeves testified that the victim was very thin, that her ribs were showing, and that her eyes were sunken. The skin on the on the victim's arms and legs was wrinkled and "just kind of hanging."

On cross-examination, Ms. Keeves agreed that she was taking photographs of an apparent crime scene. She stated that Detective Stolinsky only instructed her to photograph the room and never instructed her to collect any evidence. She did not collect the machine attached to the I.V. stand and did not know what it was. She did not test the substance inside the wine glass and noted that beer bottles in the room appeared to be closed. She did not take a sample of the yellowish stain on the car seat for testing and did not collect the containers of powdered formula. She did not know how many cigarettes

were missing from the packages and did not recall seeing any lighters or ashtrays in the room.

On redirect examination, Ms. Keeves testified that when she went to the scene, she was not told that the case was a murder investigation. She was told that a child was not breathing and was being transported to the hospital. She stated that she typically was dispatched to take photographs whenever an infant died. She acknowledged that she was aware that the case involved a murder investigation within two or three days of the victim's death and that Detective Stolinsky never asked her to return to the scene to collect evidence.

Detective Stolinsky testified that he was dispatched to the scene and that the victim had been transported to the hospital by the time he arrived. He said the Defendants' room was in "disarray," and he observed liquor bottles and empty pizza boxes in the room. He also saw a medical apparatus at the head of the bed, which he believed to be an oxygen machine because he saw a tank next to it. He testified that the policy of the police department in every infant death was to photograph the scene and that criminal charges would not necessarily result from the infant's death. He explained that the photographs and the autopsy report must be submitted to medical professionals so they can attempt to determine the reason that infants die while sleeping.

Detective Stolinsky spoke to Ms. St. Omer in the hospital and said she was upset and seemed knowledgeable about the victim's medical conditions. At the time, he believed that the victim had died as a result of natural causes. Ms. St. Omer assisted Detective Stolinsky in completing the SUIDI form. She said the victim had lost weight over the last seven days. She maintained that she last saw the victim alive at 4:30 a.m. and that she found the victim unresponsive at 8:00 a.m. in the bassinet. She stated that the victim was warm to the touch but that her hands were cool. She denied that the victim experienced vomiting or diarrhea within the seventy-two hours prior to her death and related the victim's medical issues and her abnormal weight gain and loss. She reported feeding the victim formula in a bottle and a small amount of rice within the past twenty-four hours.

The preliminary autopsy report was sent to Detective Stolinsky's office on November 20, and he reviewed the report the next day. He contacted Dr. Lewis about the report because he did not understand some of the terminology. At that point, he began to believe that the victim's death was not the result of her medical issues. When Dr. Lewis asked about a feeding pump, Detective Stolinsky said he saw medical equipment in the Defendants' room but did not know whether a feeding pump was there. Dr. Lewis advised him that the newer feeding pumps had memory and that he needed to determine whether he could obtain a history of the victim's feedings from the pump. Detective

- 6 -

Stolinsky testified that he did not know whether the victim's feeding pump retained information for a period of time or whether the pump could detect the substance that was flowing through the feeding tubes. He asked Dr. Lewis what medical facility she believed would have provided the pump, and Dr. Lewis informed him that Apria was one of the biggest medical supply companies in the area.

Detective Stolinsky spoke to an Apria employee on the same day after sending a letter via facsimile requesting the information. He asked the employee whether Apria had retrieved their medical equipment, and the employee confirmed that Apria's equipment had been retrieved from the Defendants. Detective Stolinsky testified that he mistakenly understood that Apria retrieved the feeding pump but that he later learned that Apria did not supply the feeding pump to the Defendants. Detective Stolinsky operated on his mistaken belief throughout the course of the investigation until just prior to his testimony at trial. He stated that upon speaking to the Apria employee, he abandoned any attempt to recover the victim's feeding pump. He maintained that he was unaware that the feeding pump was in the Defendants' room when the room was being photographed by the crime scene technician.

Detective Stolinsky and another officer interviewed the Defendants separately at the police department on December 17, 2013, approximately one month after the victim's death. Mr. Craighead told the officers that a medical equipment company had recently retrieved the remaining medical equipment. Mr. Craighead denied knowing that the victim's medical appointments had been missed. He said he never received any calls regarding the appointments, and he was unsure whether the medical providers contacted Ms. St. Omer regarding the appointments. He noted periods of time when the service to Defendants' cellular phones had been disconnected.

Mr. Craighead told the officers that the victim's health began to decline three or four days before her death. He explained that although the victim always looked unhealthy, her skin began to sag more in the days leading up to her death. The victim was fussier and was pulling her feeding tube out. Mr. Craighead stated that the victim had started some oral feedings and that Ms. St. Omer had fed the victim soft baby food. The officers showed Mr. Craighead photographs which they stated showed the formula dried up in the victim's feeding bags, and Mr. Craighead informed the officers that the victim had to drink a special formula that was thick and "cakey." Mr. Craighead admitted that he and Ms. St. Omer made a mistake in failing to take the victim to see a doctor upon noticing the decline in her health. He explained that he was working, was drinking alcohol, and was "in a bad place."

Ms. St. Omer told the officers that the victim's health differed daily during the course of her life. The victim vomited often and had a feeding tube. Ms. St. Omer

acknowledged missing medical appointments for the victim and explained that those appointments were stored in her cellular phone, which had stopped working. She saw a significant decrease in the victim's weight in the last week prior to her death. During that last week, the victim refused to drink from a bottle, was eating baby food, and was vomiting. Ms. St. Omer stated that nevertheless, the victim was taking some feedings, and she believed she could help her by utilizing the methods previously taught to her by medical professionals. The Defendants decided on the Friday before the victim's death to take her to the doctor on Monday, but the victim died before they did so.

On cross-examination, Detective Stolinsky testified that he returned to the Defendants' room on November 21 after he had spoken to Dr. Lewis and the employee from Apria. He believed Ms. St. Omer was standing outside, and she signed an authorization allowing the officers to obtain the victim's medical records. Detective Stolinsky did not believe that the feeding pump was in the room based upon his conversation with the Apria employee. He agreed that in hindsight, he should have verified whether the feeding pump was in the Defendants' room.

Detective Stolinsky acknowledged that he had a duty to collect evidence reflecting criminal behavior. He explained that the officers did not collect evidence from the Defendants' room on the day of the victim's death because they were "working this as a natural death case." He stated that he did not return to the Defendants' room to collect evidence three days later, after receiving the preliminary autopsy report, because the chain of custody of the evidence "would have been completely blown" by that time. Detective Stolinsky did not collect the victim's prescribed medication from the Defendants' room to determine whether the victim was actually receiving the medication. He did not research the dates in which the victim's formula was delivered and determine the amount of formula that remained at the time of the victim's death.

Ms. Madalyn Adams, a child protective service investigator with DCS, arrived at the Defendants' room while police officers were still at the scene. She offered testimony regarding the state of the Defendants' room that was consistent with testimony of the police officers at trial. She stated that she noticed a feeding pump in the room and a feeding bag which contained a powdered substance and no moisture. She did not recall seeing any notations on the victim's feeding schedule on the wall.

Ms. Adams spoke to the Defendants at the hospital, and they offered information similar to the information they provided to Detective Stolinsky during their interviews one month later. The Defendants acknowledged consuming alcohol while celebrating their anniversary on the day prior to the victim's death, and Mr. Craighead admitted using cocaine and marijuana during the week prior to the victim's death. While Ms. St. Omer

admitted to using marijuana sometime prior to the victim's death, her drug screen was negative for all substances.

On cross-examination, Ms. Adams acknowledged sending an email to Detective Stolinsky on November 19, which stated that the Defendants' room was processed as a crime scene by the police department. On redirect examination, Ms. Adams testified that although her email said it was a crime scene, neither Detective Stolinsky nor anyone else had told her that the room was processed as a crime scene.

Dr. Adele Lewis, a forensic pathologist, performed the victim's autopsy. She determined that the cause of the victim's death was starvation with DiGeorge Syndrome and acute bronchopneumonia or pneumonia in the lungs as contributory causes of death. She concluded that the manner of the victim's death was homicide. She explained that contributory causes of death are those things that a person may die with but not necessarily of. She testified that the victim's congenital heart defect, acute bronchopneumonia, and DiGeorge Syndrome were not the immediate causes of her death.

Dr. Lewis stated that it was "pretty obvious" that the victim was malnourished based on her appearance. The victim's weight at her death at the age of five months was the same as her birth weight. She had bilious fluid in her stomach that came from her gallbladder, no fluid in her small intestines, and a small amount of green liquid in her rectum. The victim had some hair growing on her forehead, which Dr. Lewis stated can be a reaction of malnutrition. The victim also had elevated levels of protein in the fluid of her eye, which is indicative of dehydration. Her eyes were sunken, and her skin did not have normal elasticity. While generally food products and stool can be seen throughout the intestines, the victim's intestines were empty and decompressed. Dr. Lewis stated that although the victim had some stool in her rectum, this only suggested that the victim may have been fed intermittently, but she was not fed a sufficient amount. Dr. Lewis also stated that some of the liquid or stool in the rectum could have been the result of shedding of the cells lining the inside of the intestine. The victim had elevated vitreous, nitrogen, and creatinine levels indicative of moderate dehydration.

Dr. Lewis testified that if the victim had an abnormality in her intestines or was incapable of gaining weight, she would not have concluded that the manner of the victim's death was homicide. Dr. Lewis noted that the victim demonstrated that she was capable of gaining weight because she gained weight while hospitalized for failure to thrive and gained weight at home following her discharge. She estimated that the process of the victim's failing to receive adequate nutrition and hydration that led to her death lasted at least one week.

Dr. Lewis viewed photographs of the Defendants' room and said the victim's feeding bag attached to the pump appeared to be empty. She recalled advising a police officer that it might have been possible for an employee of the feeding pump manufacturer to examine the device and determine whether it had been recently used. Dr. Lewis stated, "That was just an educated guess on my part." She did not know what information would have been retained in the feeding pump or the time period in which the information would have been retained. She explained that she based her belief on the fact that most medical equipment has a computer that retains information for a period of time.

On cross-examination, Dr. Lewis testified that she would have considered information from the feeding pump showing that the victim had been fed in accordance with the medical provider's orders for a period of time to be important. She stated that had the victim been fed as required with the correct formula and continued to demonstrate an incapability of gaining weight, she would have found that the manner of death was "undetermined" rather than homicide.

At the conclusion of the State's proof, the trial court denied the Defendants' motions for a judgment of acquittal on the charges. The trial court granted the Defendants' prior request for a mistrial based upon improper testimony regarding Mr. Craighead's selling drugs.

The trial court also granted the Defendants' motions to dismiss the charges based upon a *Ferguson* violation. The trial court acknowledged that the State may not have a duty to collect any evidence but that the pattern jury instruction presumed that the police would gather and preserve relevant evidence. The trial court found that when the Defendants' room was photographed, the police officers should have been aware of that the case possibly involved charges of child neglect based upon the condition of the Defendants' room. The trial court also found that the officer should have been aware of possible felony murder charges due to the presence of evidence of neglect in the death of a child less than eight years old. The trial court noted that none of the evidence at the scene was collected, that the State indicated a pattern of neglect based on the appearance of the room, and that witnesses testified at trial about the inferences to be drawn from the photographs, including the possibility of dried formula in the feeding bag.

The trial court found that while there may not have been any exculpatory evidence stored in the feeding pump, the feeding pump was relevant and should have been collected and preserved to allow the defense an opportunity to determine if relevant evidence was stored on the machine. The trial court also found that the police officers should have secured the scene until they obtained a preliminary autopsy report. As a

result, the trial court dismissed the Defendants' charges. The State filed a notice of appeal.

## ANALYSIS

The State contends that the trial court erred in dismissing the Defendants' charges based upon the State's failure to collect the feeding machine and preserve information on the machine. The State maintains that it did not have a duty to collect the evidence and that the evidentiary value of the feeding machine was not established. Ms. St. Omer responds that the trial court's ruling was not limited to the State's failure to collect and preserve the feeding machine and its information but encompassed the State's failure to collect and preserve any of the items in the Defendants' room related to the victim's care. The Defendants further respond that the evidence possessed potential exculpatory value and that the State had a duty to collect and preserve the evidence.

In *State v. Ferguson*, our supreme court held that "the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial." *State v. Merriman*, 410 S.W.3d 779, 784 (Tenn. 2013) (citing *State v. Ferguson*, 2 S.W.3d 912, 915-16 (Tenn. 1999)). Upon determining that the due process clause under the Tennessee Constitution was broader than the due process clause under the United States Constitution, the Tennessee Supreme Court rejected the "bad faith" analysis adopted by the United States Supreme Court which provided that "'unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.'" *Id.* at 784-85 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)). Rather, the court in *Ferguson* adopted a balancing approach requiring the trial court to determine "'[w]hether a trial, conducted without the [lost or] destroyed evidence, would be fundamentally fair.'" *Id.* at 785 (quoting *Ferguson*, 2 S.W.3d at 914).

Whenever a *Ferguson* claim is raised, the trial court must first determine "whether the State had a duty to preserve the evidence." *Id.* "[T]he State's duty to preserve evidence is limited to constitutionally material evidence described as 'evidence that might be expected to play a significant role in the suspect's defense.'" *Id.* (quoting *Ferguson*, 2 S.W.3d at 917). To meet the constitutionally material evidence standard, "the evidence must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* (footnote omitted).

If the proof establishes that the State had a duty to preserve the evidence and that the State failed in its duty, the court must conduct a balancing analysis, considering the following factors:

1. The degree of negligence involved;

2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

3. The sufficiency of the other evidence used at trial to support the conviction.

*Ferguson*, 2 S.W.3d at 917 (footnote omitted). The trial court must balance these factors to determine whether a trial would be fundamentally fair absent the missing evidence. *Merriman*, 410 S.W.3d at 785. If the trial court concludes that a trial would be fundamentally unfair absent the missing evidence, "the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." *Id.* at 786.

This court reviews the trial court's decision regarding the fundamental fairness of a trial conducted without the missing evidence de novo. *Id.* at 791. The trial court's findings of fact are conclusive on appeal unless the evidence preponderates against them. *See id.* (citations omitted). This court reviews the trial court's remedy for a *Ferguson* violation under the abuse of discretion standard. *Id.*

On appeal, the State focuses upon whether it had a duty to seize and preserve the feeding machine. However, in dismissing the Defendants' charges, the trial court not only focused upon the State's failure to seize and preserve the feeding machine but also found that the State failed to seize and preserve any evidence from the Defendants' room while utilizing photographs of such evidence at trial to support the allegations of child neglect.

During oral argument before this court, the State contended that the officers were not conducting a criminal investigation on the date of the victim's death and did not have probable cause to seize any evidence from the Defendants' room at that time. The State based its contentions upon Detective Stolinsky's testimony that at the time, he believed the victim died of natural causes based upon her medical history. However, the detective acknowledged that the officers were conducting an investigation into the circumstances of the victim's death. After the victim was transported from the scene, the officers remained inside the Defendants' room, and a crime scene technician was dispatched to the scene to document the condition of the room through photographs. Multiple officers testified at trial regarding the condition of the victim, including testimony that her bones were protruding through her skin, she did not appear to have any fat on her, and she did

not appear to be real. A photograph of the victim following her death that was entered as an exhibit at trial supports the officers' description of the victim. Detective Stolinsky interviewed the Defendants at the hospital following the victim's death regarding the circumstances that led to her death and when she was last fed.

The officers also testified regarding the condition of the Defendants' room. After a DCS referral was made, Ms. Adams went to the scene, testified to observing what she considered to be deplorable conditions, and communicated to the police about her observations. Ms. Adams believed that the officers were conducting a criminal investigation as evidenced by her e-mail to Detective Stolinsky the following day. The actions of the officers on the day of the victim's death and the facts and circumstances of the case belie the State's claim that the officers were not conducting a criminal investigation at the time. We conclude that based on the facts and circumstances, the State had probable cause to believe that the Defendants committed child neglect and, thus, could have obtained a search warrant for the Defendants' room following the victim's death. *See State v. Henning*, 975 S.W.2d 290, 294 (Tenn. 1998) (defining probable cause necessary for the issuance of a search warrant as "a reasonable ground for suspicion, supported by circumstances indicative of an illegal act").

Regardless, the State maintains that it had no duty to collect the evidence. The Defendants respond that *Ferguson* recognizes that the State has a duty to "gather" evidence but that the evidence in this case was under the State's control while the officers conducted the investigation in the Defendants' room following the victim's death.

In *Ferguson*, the Tennessee Supreme Court did not impose a duty upon the State to collect evidence but addressed the State's duty to preserve evidence. *See Ferguson*, 2 S.W.3d 912. *Ferguson* involved the State's failure to preserve a video recording of the defendant's performing field sobriety tests at a police station following his arrest for driving under the influence. *Id.* at 914-15. In reaching its decision, the court in *Ferguson* discussed two opinions from the United States Supreme Court: *California v. Trombetta*, 467 U.S. 479 (1984), and *Youngblood*, 488 U.S. 51. *Trombetta* involved the State's failure to preserve samples of a defendant's breath-analysis test, and *Youngblood* addressed the police officer's failure to refrigerate semen-stained clothing collected from a sodomy victim which precluded testing of the clothing. *See Trombetta*, 467 U.S. at 481; *Youngblood*, 488 U.S. at 58. Neither case addressed the State's duty to collect the evidence but addressed the State's failure to preserve the evidence once it was collected.

Our supreme court in *Ferguson* included in a footnote a jury instruction that a trial court may employ upon finding that the State's destruction of evidence violated a defendant's constitutional right to a fair trial. 2 S.W.3d at 917 n.11. The jury instruction provides in part, "The State has a duty to gather, preserve, and produce at trial evidence

which may possess exculpatory evidence." *Id.* The court cited to *Trombetta* and *State v. Willits*, 393 P.2d 274, 276 (Ariz. 1964), in support of the instruction. However, neither *Trombetta* nor *Willits* addressed whether the State has a duty to collect evidence but addressed the State's failure to preserve evidence already in the State's possession. *See Trombetta*, 467 U.S. at 481; *Willits*, 393 P.2d 276-78 (holding that the trial court erred in failing to instruct the jury that if the jury determined that the State destroyed evidence whose contents or quality are at issue, the jury may infer that the evidence did not support the State's interests).

On numerous occasions, this court has held that a law enforcement officer's failure to collect certain items from a crime scene did not result in a *Ferguson* violation. *See e.g., State v. Joshua Hunter Bargery*, No. W2016-00893-CCA-R3-CD, 2017 WL 4466559, at *62-64 (Tenn. Crim. App. Oct. 6, 2017), *no perm. app. filed* (holding that the State's failure to collect a bloody towel, fruit punch cans, blood stain samples, and fingerprints did not violate *Ferguson* because the State had no duty to collect such items); *State v. Mario Hubbard*, No. W2016-01521-CCA-R3-CD, 2017 WL 2472372, at *6-8 (Tenn. Crim. App. June 7, 2017), *no perm. app. filed* (concluding that the State did not have a duty to preserve surveillance footage from a crime scene when officers failed to collect the footage); *State v. Cordell Bufford*, No. W2013-00841-CCA-R3-CD, 2014 WL 2129526, at *12-13 (Tenn. Crim. App. May 20, 2014) (rejecting the defendant's claim that "the State should have collected more evidence because that evidence *might have been* exculpatory" (emphasis in original)); *State v. Brock*, 327 S.W.3d 645, 698-99 (Tenn. Crim. App. 2009) (holding that the State did not have a duty to collect fingerprint evidence and a bloody footprint from the crime scene); *State v. Yevette Somerville*, No. W2001-00902-CCA-R3-CD, 2002 WL 1482730, at *4-5 (Tenn. Crim. App. Feb. 11, 2002) (concluding that the State did not have a duty to preserve surveillance footage from the scene of a Wal-Mart for a shoplifting charge when the State never had possession or control over the footage).

In concluding that the State's failure to collect evidence from a crime scene does not rise to the level of a *Ferguson* violation, this court has recognized that

> "the State is not required to investigate cases in any particular way: Due process does not require the police to conduct a particular type of investigation. Rather, the reliability of the evidence gathered by the police is tested in the crucible of a trial at which the defendant receives due process. Moreover, [i]t is not the duty of this Court to pass judgment regarding the investigative techniques used by law enforcement unless they violate specific statutory or constitutional mandates."

*Brock*, 327 S.W.3d at 698-99 (quoting *State v. Tony Best*, No. E2007-00296-CCA-R3-CD, 2008 WL 4367529, at \*13 (Tenn. Crim. App. Sept. 25, 2008)) (internal citations omitted).

The Defendants rely upon this court's opinion in *State v. Clifford Edward Clark* to support their claim that the police officers had a duty to collect evidence from the Defendants' room. No. E2009-01795-CCA-R3-CD, 2011 WL 13165164 (Tenn. Crim. App. Oct. 24, 2011). In *Clifford Edward Clark*, the defendant was charged with various offenses stemming from his shooting a red light camera. *Id.* at \*1-5. The defendant argued that his charges should have been dismissed because the traffic camera housing, which he maintained was in the custody and control of the State, was no longer available for testing. *Id.* at \*6. During the hearing, the State averred that police officers took photographs of the traffic camera housing and retained the equipment inside the housing, and the company that owned the camera housing took custody of the housing and disposed of it. *Id.* at \*12. The State further argued during the hearing that although the housing was never in the State's custody, the State took photographs of the housing and its bullet holes. *Id.* On appeal, this court addressed the issue of whether the State had a duty to retain the evidence and concluded that the State had a duty to preserve the camera housing and that its failure to do so violated *Ferguson*. *Id.* at \*13-15. However, this court did not address whether the State had a duty to collect or seize the evidence. *See id.* at \*11-13. Rather, the analysis assumes that the State or an arm of the State had possession of the camera housing at some point and failed to maintain it.

We conclude that this court's opinion in *Brock* that an officer's failure to collect evidence from a crime scene owned, operated, or maintained by a private citizen does not violate *Ferguson* controls. *See Brock*, 327 S.W.3d at 698-99; *see also* Tenn. Sup. Ct. R. 4(G)(2) ("Opinions reported in the official reporter…shall be considered controlling authority for all purposes unless and until such opinion is reversed or modified by a court of competent jurisdiction."). The Defendants have not shown that the investigative techniques used by law enforcement violated "'specific statutory or constitutional mandates.'" *Brock*, 327 S.W.3d at 699 (quoting *Tony Best*, 2008 WL 4367529, at \*13). We hold that the police officers had no duty to collect evidence from the Defendants' room and, therefore, no duty under *Ferguson* to preserve such evidence. Accordingly, the trial court erred in dismissing the Defendants' charges.

The State is required to prove its case beyond a reasonable doubt, and we recognize that the failure to gather physical evidence at a crime scene often weakens the State's ability to prove its case. Accordingly, on remand, the Defendants may test the reliability of the State's evidence at trial by examining the State's witnesses about any relevant deficiencies of the investigation and arguing any shortcomings in the investigation against the standard of reasonable doubt.

**CONCLUSION**

Upon reviewing the record and the applicable law, we reverse the trial court's dismissal of the Defendants' charges, reinstate the indictment, and remand for further proceedings.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE